NCCMI, Inc. v Bersin Props., LLC (2024 NY Slip Op 01161)

NCCMI, Inc. v Bersin Props., LLC

2024 NY Slip Op 01161

Decided on March 05, 2024

Appellate Division, First Department

OING, J. 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: March 05, 2024
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Sallie Manzanet-Daniels
Jeffrey K. Oing Barbara R. Kapnick Bahaati E. Pitt-Burke John R. Higgitt

Index No. 650276/15 Appeal No. 1058 Case No. 2022-01555 

[*1]NCCMI, Inc., Plaintiff-Appellant-Respondent,
v
Bersin Properties, LLC, et al., Defendants-Respondents-Appellants.

Plaintiff appeals and defendants cross-appeal from the order of the Supreme Court, New York County (Robert R. Reed, J.), entered March 14, 2022, which, to the extent appealed from as limited by the briefs, denied plaintiff's motion for summary judgment on its claim against defendant Congel for personal liability under the Guaranty, and denied defendants' motion for partial summary judgment dismissing the claim.

Greenberg Traurig, LLP, New York (Steven Sinatra, Richard A. Edlin, Daniel R. Milstein and Ashley A. LeBlanc of counsel), for appellant-respondent.
Law Office of David Tennant PLLC, Rochester (David H. Tennant of counsel), and Catafago Fini LLP, New York (Tom M. Fini of counsel), for respondents-appellants.

OING, J. 

This appeal concerns a purported $44 million scrivener's error in a guaranty, exposing defendant Scott Congel, an Indemnitor under the guaranty, to personal liability. It also is a reminder that proofreading is an essential, indispensable tool in the drafting of contracts.
Defendant Bersin Properties, LLC (Bersin Properties) entered into a $135 million Amended and Restated Loan Agreement dated January 29, 2007 (the Loan Agreement), as borrower, with Nomura Credit & Capital, Inc. (Nomura), plaintiff NCCMI, Inc.'s predecessor, as lender, for the purpose of renovating and re-leasing the Medley Centre, a struggling shopping mall located in Monroe County, New York (the Property). The Loan Agreement provided that the loan would mature on February 9, 2009, but permitted Bersin Properties to extend the maturity date by up to three successive one-year periods. The Loan Agreement also provided for three loans, each of which was secured by a mortgage encumbering the Property. Although the loan was nonrecourse, which limited Nomura's remedies for nonpayment to possession of the Property by bringing a "foreclosure action, an action for specific performance or any other appropriate action or proceeding," the Loan Agreement provided for two carve-outs that would permit Nomura to have recourse against Bersin Properties — recourse for losses resulting from specific bad acts (loss recourse indemnity) and recourse for repayment of the entire debt upon occurrence of certain triggering events (full debt recourse liability). Congel, Bersin Properties' principal, was designated as the guarantor in the Loan Agreement.
Congel executed an Indemnity and Guaranty Agreement (the Guaranty) in connection with the loan. He was the only one to execute the Guaranty, and did so as an "Indemnitor." The Guaranty sets out Bersin Properties' and Congel's respective obligations upon the occurrence of certain events. Specifically, it provides that Bersin Properties, as borrower, and Congel, individually, both collectively referred to as "Indemnitor," would, jointly and severally, guarantee payment of Bersin Properties' recourse obligations to Nomura. Similar to the Loan Agreement, the Guaranty provides for a loss recourse indemnity and a full debt recourse liability[*2]. The loss recourse indemnity provides that "Indemnitor," namely Bersin Properties and Congel, assumes liability for certain enumerated bad acts. As to full debt recourse liability, the Guaranty states, in relevant part:
"the Debt shall be fully recourse to Borrower . . . if Borrower defaults hereunder in any way and Borrower or any Guarantor contests or in any way interferes with, directly or indirectly, any foreclosure action . . . or with any other enforcement of Lender's rights, powers or remedies under any of the Loan Documents or under any document evidencing, securing or otherwise relating to all or any portion of the Property (whether by . . . bringing any counterclaim, claiming any defense . . . .)" (emphasis added).
Nomura conveyed its right, title, and interest in the loan to plaintiff NCCMI, Inc. on March 25, 2008. Thereafter, plaintiff funded dozens of draw requests under the Loan Agreement, ultimately lending Bersin Properties over $44 million. The loan matured on February 9, 2009. Bersin Properties did not repay any portion of the debt, thereby defaulting under the terms of the Loan Agreement.
On April 25, 2014, more than five years after the loan matured, Bersin Properties and Congel commenced an action against Nomura and plaintiff alleging, among other things, that plaintiff breached the Loan Agreement by refusing to extend the maturity date and by refusing to fund an additional $54 million draw request after that time. Supreme Court granted Nomura summary judgment dismissing the complaint. In affirming, this Court held that Bersin Properties had breached the Loan Agreement, which "disqualified it from both extending the loan's maturity date and receiving further loan advances" (Bersin Props., LLC v Nomura Credit & Capital, Inc., 213 AD3d 431, 431 [1st Dept 2023]).
On January 30, 2015, plaintiff commenced this action against Bersin Properties seeking to foreclose on the mortgages on the Property. On March 24, 2015, Bersin Properties answered the complaint, asserting 14 affirmative defenses. In January 2016, Bersin Properties lost title to the Property in a sheriff's sale that was held to satisfy a junior lienholder's judgment against it. Plaintiff elected to release its mortgages on the Property to the new owner for $4 million due to the minimal value of the Property, as a conseq1uence of Bersin Properties' failure to develop the Property, and the costs in maintaining it. In March 2016, plaintiff sought leave to convert its foreclosure action to a plenary action seeking recourse on the underlying promissory notes and the Guaranty for full recovery of the debt, minus the $4 million already received. Supreme Court granted the motion, and plaintiff served a second supplemental complaint in the converted action. Bersin Properties and Congel filed a joint answer interposing 19 affirmative defenses.
After several years of discovery, plaintiff and defendants moved for summary judgment. As is relevant to this appeal, both sought summary [*3]judgment as to Congel's personal liability under the Guaranty. In seeking to hold Congel personally liable, plaintiff contended that Bersin Properties and Congel triggered full debt recourse liability when Bersin Properties contested the foreclosure action by filing an answer and interposing affirmative defenses. Plaintiff acknowledged that the Guaranty provides that the debt would be "fully recourse to Borrower" upon the occurrence of a full debt recourse triggering event, and not "fully recourse to Indemnitor," seemingly insulating Congel from the loan indebtedness. It further noted that the language in this recourse provision is a virtual mirror image of the provision set forth in the Loan Agreement, and posited that a scrivener's error occurred insofar as the term "Borrower" was not deleted and replaced with "Indemnitor" when the Loan Agreement's provision was inserted into the Guaranty. It argued that the Guaranty plainly contemplated for liability to run to Congel for full debt recourse. For support, plaintiff pointed to the Guaranty's preamble, and numerous additional terms and provisions within the Guaranty. Thus, plaintiff contended that to make only Bersin Properties liable, as opposed to Congel and Bersin Properties, as Indemnitor, would lead to an absurd result because Bersin Properties, as a single-purpose entity with no assets other than the Property, would then become its own guarantor.
Defendants argued that plaintiff's claim of scrivener's error was time-barred under the applicable six-year statute of limitations for reformation of a contract. In any event, defendants contended the literal reading of the Guaranty indicated that full debt recourse liability was available only to Bersin Properties, as "Borrower," and not to Congel, as an "Indemnitor." In addition to the language of the Guaranty itself, defendants relied on, among other things, Congel's deposition testimony, wherein he testified that he never understood himself to be personally guaranteeing the full debt, and a July 2008 email from plaintiff's president, which referred to the parties' agreement and stated, among other things, that "the payments [were] not guaranteed by anyone in this loan." Lastly, defendants argued that holding Congel personally liable just because Bersin Properties responded to the foreclosure action would be contrary to public policy.
Supreme Court denied plaintiff's motion to the extent it sought summary judgment on its claim for personal liability against Congel, and denied defendants' motion for partial summary judgment dismissing the claim.[FN1] In doing so, the court found the language "fully recourse to Borrower" to be ambiguous. The court noted that while the literal terms appear to have exempted Congel from personal liability for Bersin Properties' debt, there was a "clear tension" between the "fully recourse to Borrower" provision and the rest of the Guaranty. The court further found that extrinsic evidence did not result in a clear understanding [*4]that the inclusion of "Borrower" instead of "Indemnitor" had been intentional. Thus, the court declined to substitute "Borrower" for "Indemnitor," noting that plaintiff did not meet its burden of identifying absurdity or unenforceability in the Guaranty.
The record establishes that the Guaranty's full debt recourse liability was triggered when Bersin Properties filed an answer, with affirmative defenses, in the foreclosure action, and when Bersin Properties and Congel jointly filed an answer, with affirmative defenses, in the plenary action. The question that remains is whether Congel, as an Indemnitor, is subject to full debt recourse liability under the Guaranty. For the reasons that follow, consideration of the parties' arguments based on extrinsic evidence to resolve this issue is not necessary.
A claim for reformation of a contract, including reformation based on a scrivener's error, is governed by the six-year statute of limitations, which begins to run on the date that the mistake is made (CPLR 213[6]; 1414 APF, LLC v Deer Stags, Inc., 39 AD3d 329, 330 [1st Dept 2007]). Any purported mistake was made on January 4, 2007, when the alleged scrivener's error occurred. This claim is time-barred because plaintiff commenced this action eight years later, on January 30, 2015. Nevertheless, a court may correct a scrivener's error outside of a claim for reformation of a contract in "those limited instances where some absurdity has been identified or the contract would otherwise be unenforceable either in whole or in part" (Matter of Wallace v 600 Partners Co., 86 NY2d 543, 547-548 [1995]; see also Jade Realty LLC v Citicorp Commercial Mtge. Trust 2005-EMG, 20 NY3d 881, 883-884 [2012]). In other words, a court is not "constrained to adopt an absurd phrasing in the contract merely because the statute of limitations for reformation had passed, when the error is obvious and the drafters' intention clear" (Slifka v Slifka, 177 AD3d 418, 419 [1st Dept 2019]). Absent such an absurdity or unenforceability, "clear, complete writings should generally be enforced according to their terms" to impart "stability to commercial transactions by safeguarding against fraudulent claims, perjury, death of witnesses . . . [and] infirmity of memory" (W.W.W. Assoc. v Giancontieri, 77 NY2d 157, 160, 162 [1990] [internal quotation marks omitted]). A party seeking reformation based on a scrivener's error has the high burden of showing an obvious error by clear and convincing evidence (see Warberg Opportunistic Trading Fund, L.P. v Georesources, Inc., 112 AD3d 78, 84-85 [1st Dept 2013]).
Our decision in PNC Capital Recovery v Mechanical Parking Sys. (283 AD2d 268 [1st Dept 2001], lv dismissed 96 NY2d 937 [2001], appeal dismissed 98 NY2d 763 [2002]) is dispositive concerning the issue of the scrivener's error. In PNC Capital, a corporation's creditor commenced an action against its president, Shlomo Kadosh, individually, on a guaranty of the corporation's debt that Kadosh had [*5]signed. Kadosh argued that the presence of his title "president" immediately below his signature line on the guaranty established that he was not personally liable under the guaranty because he had signed it in his capacity as corporate president. We unanimously rejected this argument as a matter of law after reading the guaranty as a whole and in the context of the entire transaction, and granted the creditor summary judgment on its claim against Kadosh. Notably, as is relevant to this appeal, we held that to permit a corporation to guarantee its own indebtedness was illogical and rendered meaningless the entire guaranty:
"Further, an interpretation that Kadosh signed the Guaranty solely in his capacity as president of the corporation [Mechanical] would compel the illogical conclusion that the purpose of the Guaranty was to provide that in case of Mechanical's default, the company would guaranty its own indebtedness, rendering the entire Guaranty meaningless" (id. at 270-271).
PNC Capital's logic applies to this case. For us to accept a literal reading of the Guaranty's full debt recourse liability to apply to the "Borrower" instead of "Indemnitor" as urged by defendants would countenance an "illogical" result, namely, Bersin Properties, as a single-purpose entity with no assets other than the Property, would be guaranteeing its own debt. That result renders the Guaranty illusory and meaningless, particularly given that the Property was encumbered at the time of the Guaranty and, notably, already lost in an unrelated foreclosure action when plaintiff sought to enforce the Guaranty.
Defendants argue that PNC Capital is inapplicable because it is distinguishable from the facts herein. They point out that PNC Capital involved a defendant guarantor who sought to avoid personal liability simply by asserting that he signed the guaranty as the company's president. Defendants contend that Congel is not suggesting, as in PNC Capital, that the Guaranty should never apply to him. In fact, they note that Congel, as an Indemnitor, is personally liable for losses under the loss recourse indemnity. Instead, defendants argue that Congel, as an Indemnitor, is not personally liable for the loan principal under the circumstances herein. According to defendants, the fact that a different, separate provision of the Guaranty, namely, the full debt recourse liability, assigns an obligation to Bersin Properties alone hardly renders the Guaranty "illusory." This argument is without merit.
Defendants' argument seeks to compartmentalize the Guaranty into two separate and mutually exclusive components — a loss recourse indemnity versus a full debt recourse liability. Compartmentalizing the recourse obligations in this manner fails to read the Guaranty as a whole (see Greenwich Capital Fin. Prods., Inc. v Negrin, 74 AD3d 413, 415 [1st Dept 2010]). The clear and unambiguous purpose of the Guaranty is to guarantee both the losses incurred under the Loan Agreement and Bersin [*6]Properties' loan obligations under that agreement. Further, the literal application of the phrase "fully recourse to Borrower" only to Bersin Properties and not to Congel, as an Indemnitor, as persisted by defendants would render the full debt recourse liability portion of the Guaranty meaningless and illusory because Bersin Properties is not a signatory to the Guaranty and would not be bound by terms of the Guaranty. Thus, the loan indebtedness would be unguaranteed, undermining the purpose of the Guaranty.
Moreover, a guaranty must be read in the context of the loan agreement and "in a manner that accords the words their 'fair and reasonable meaning,' and achieves 'a practical interpretation of the expressions of the parties'" (id., quoting Duane Reade, Inc. v Cardtronics, LP, 54 AD3d 137, 140 [1st Dept 2008]). In other words, a "contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties" (id., quoting Matter of Lipper Holdings v Trident Holdings, 1 AD3d 170, 171 [1st Dept 2003]). Certain provisions of the Guaranty confirm that the full debt recourse liability runs to Congel, as an Indemnitor, rather than to "Borrower." Specifically, the paragraph immediately following the full debt recourse liability provision declares that "[t]he liability of Indemnitor under this Agreement shall be direct and immediate"; that "Indemnitor waives any right to require that an action be brought against Borrower [Bersin Properties] or any other personor to require that resort be had to any collateral for the Loan"; that "Indemnitor shall nevertheless be fully liable" for the debt even if Borrower's liability is relieved by bankruptcy or other debtor relief law; and that "Indemnitor shall remain liable for all remaining indebtedness and obligations guaranteed hereby" even if the loan is partially repaid from other sources or by foreclosure. Further, section 4 of the Guaranty, which provides for the waiver of defenses by the Indemnitor, would be rendered meaningless if the Indemnitor were not personally liable for repayment of the debt. Additionally, section 5(b) of the Guaranty states that "Lender would not make the Loan but for the unsecured personal liability undertaken by Indemnitor herein." If Congel, as an Indemnitor, is not, under any circumstances, personally liable for the loan, these provisions would be relegated to meaningless surplusage (see Greenwich Capital, 74 AD3d at 415 [rejecting interpretation that relies on "formalistic literalism," ignores common sense, and could lead to absurd results]). More importantly, these terms all provide clear and convincing intrinsic proof that the use of the phrase "recourse to Borrower" instead of "recourse to Indemnitor" in the Guaranty was an obvious scrivener's error.[FN2]
Accordingly, the order of the Supreme Court, New York County (Robert R. Reed, J.), entered March 14, 2022, which, to the extent appealed from as limited [*7]by the briefs, denied plaintiff's motion for summary judgment on its claim against defendant Congel for personal liability under the Guaranty, and denied defendants' motion for partial summary judgment dismissing the claim, should be modified, on the law, to grant plaintiff's motion, and otherwise affirmed, without costs.
Order, Supreme Court, New York County (Robert R. Reed, J.), entered March 14, 2022, modified, on the law, to grant plaintiff's motion for summary judgment on its claim against defendant Congel, and otherwise affirmed, without costs.
Opinion by Oing, J. All concur.
Manzanet, J.P., Oing, Kapnick, Pitt-Burke, Higgitt, JJ.
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: March 5, 2024

Footnotes

Footnote 1: Supreme Court granted summary judgment to plaintiff on its cause of action against Bersin Properties for breach of the Loan Agreement, given that the loan had matured and had not been repaid, and ordered that judgment be entered against Bersin Properties in the amount of $44,020,365.25, less the sum of $4 million already recovered, plus interest. Defendants did not appeal this determination.
Footnote 2: Defendants' contention that the litigation privilege should be applied in this action so as to render the full debt recourse liability unenforceable is also unavailing. The litigation privilege protects statements made in judicial proceedings as nonactionable for defamation claims (see Front, Inc. v Khalil, 24 NY3d 713, 718 [2015]). Defendants failed to set forth what statements made by Bersin Properties or Congel would be subject to the litigation privilege. Nor is this liability against public policy, which does not prevent parties from entering into voluntary agreements affecting their ability to litigate, but, instead, favors freedom of contract (see Centi v McGillin, 34 NY3d 1072, 1073 [2019]).